IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JOHN McCOTTRELL and DUSTIN CLAY, | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) ) | Case No. 15-CV-03208 |
| | ) | Hon. Amy J. St. Eve |
| CORRECTIONAL OFFICERS, MARCUS, WHITE, LABARIN WILLIAMS, SALEH OBAISI, M.D., and WEXFORD HEALTH SOURCES, INC., et al., | ) ) ) ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Defendants Marcus White ("White") and Labarin Williams ("Williams"), collectively, "the Officer Defendants," have moved for summary judgment on Count I of Plaintiffs John McCottrell and Dustin Clay's Complaint brought pursuant to 42 U.S.C. § 1983. (R. 76, Defs.' Mem. of Law in Support of Mot. for Summ. J.) For the following reasons, the Court grants the Officer Defendants' motion for summary judgment.

## BACKGROUND

This case arises from injuries Plaintiffs, both of whom were inmates at Stateville Correctional Center ("Stateville"), suffered on November 6, 2013, after the Officer Defendants discharged shotguns causing shotgun pellets to strike Plaintiffs. (R. 75, Defs.' Statement of Facts ¶¶ 1, 6.) Plaintiffs have sued the Officer Defendants pursuant to 42 U.S.C. § 1983 alleging that the Officer Defendants deprived them of their rights under the Eight Amendment by using excessive force in discharging their firearms.

1

**I.     The Dining Hall**

On November 6, 2013, the Officer Defendants were both stationed in the Stateville dining hall guard tower, which is about 15 feet above the ground. (*Id.* ¶¶ 2, 15.) Correctional officers on the ground floor of the dining hall are generally armed with pepper spray, and the officers in the tower are armed with firearms. (*Id.* ¶ 33.) The Officer Defendants were each armed with a loaded shotgun. (R. 83, Pls.' Statement of Facts ¶ 8.) There is a "target box" at the same level of the guard tower, and there is also a "shot box"[1] in the dining hall seating area, as well as in other areas in the dining hall. (Defs.' Statement of Facts ¶¶ 15-16.) Inmates largely outnumber correctional officers in the dining hall, and inmates are not placed in hand restraints or foot restraints while in the dining hall. (*Id.* ¶30-31.) Fights are more common in the dining hall because it is one of the only places at Stateville where large groups—often between 300 and 400— of unrestrained inmates are able to congregate. (*Id.* ¶¶ 34-37.) According to the Officer Defendants, fights between inmates pose a serious threat to everyone in Stateville because the fights often escalate quickly, inmates refuse to be subdued, and inmates sometimes utilize makeshift but dangerous weapons to harm officers and others. (*Id.* ¶¶ 38-40.)

Plaintiffs were both incarcerated at Stateville and at the time of the incident, they were in the dining hall for lunch. (*Id.* ¶ 7.) The Stateville dining hall is a semicircle that is divided into different sections. (*Id.* ¶ 8.) Inmates attend meals with other inmates in their cell house and they are separated in the dining hall according to the floor ("gallery") on which they reside. (*Id.* ¶¶ 9-10.) On the date of the incident, Plaintiffs both lived in D-House on gallery nine. (*Id.* ¶ 11.) D-House contains about 400 inmates. (*Id.* ¶ 12.) Prior to the incident, inmates from galleries nine

---

[1] Plaintiffs used the term "target box" interchangeably with the term "shot box."

and seven, including Plaintiffs, had already sat down in two sections of the dining hall, and about 50 inmates from gallery five were entering the dining hall. (*Id.* ¶¶ 13-14.)

## II. The Plaintiffs' Perspective of the Incident

The incident started when two non-party inmates began fighting while in line to enter the dining hall. (*Id.* ¶ 17; Defs.' Statement of Facts, Ex. F, Dining Room Video.) Clay recalled that the two inmates were fighting for approximately three seconds before officers intervened, and McCottrell recalled that the inmates fought for less than a minute before he heard a gunshot. (Defs.' Statement of Facts ¶¶ 19-20; Ex. C, Dep. of Dustin Clay 24: 12-14.) The video of the incident shows the two non-party inmates wrestling and holding each other, but it is not clear if either inmate threw a punch. (Dining Room Video.) Neither inmate had or used a weapon. (Pls.' Statement of Facts ¶ 3.) The video shows the two inmates struggling with each other for approximately 20 seconds before several correctional officers intervened to separate and handcuff the fighting inmates. (*Id.* ¶¶ 5-6; Dining Room Video.) At least one officer used pepper spray to subdue the fighting inmates. (Pls.' Statement of Facts ¶ 6.) After the officers separated the fighting inmates, one inmate refused to be subdued and struggled with the officers for approximately another 20 seconds. (Dining Room Video.) At the time of the incident, Plaintiffs were seated at tables in the dining hall about 40-50 feet away from the fighting inmates. (Pls.' Statement of Facts ¶ 7.)

After the officers on the ground separated the fighting inmates, the Officer Defendants simultaneously fired their shotguns, causing Plaintiffs to be struck with shotgun pellets. (*Id.* ¶ 9.) The pellets struck McCottrell in his leg and neck and Clay in his right elbow. (Defs.' Statement of Facts ¶¶ 28-29.) Both Plaintiffs heard only one shot. (*Id.* ¶¶ 21-22.) Clay recalled that the "fight was under control," and officers were in the process of handcuffing the fighting inmates

3

when the Officer Defendants fired their weapons. (Dep. of Clay, 25: 2-14.) A report by the Illinois Department of Corrections Internal Affairs Department concluded that the Officer Defendants fired their weapons after the officers had separated the fighting inmates in violation of department regulations. (Pls.' Statement of Facts, Ex. 1 4-5.) In their reports after the incident, both the Officer Defendants failed to note that they fired their weapons after officers separated the inmates. (Pls.' Statement of Facts ¶ 12.) Neither Plaintiff observed the direction that the Officer Defendants were pointing their guns when they fired the shots that hit Plaintiffs, but both believe that the Officer Defendants must have been pointing their guns at Plaintiffs. (Defs.' Statement of Facts ¶¶ 24-27.)

Plaintiffs' Statement of Facts also includes several assertions from documents or witnesses that the Officer Defendants argue constitute hearsay, including the Officer Defendants' report regarding the incident, the Department of Corrections internal report about the incident, and statements other inmates made to Plaintiff McCottrell. (*See* Pls.' Statement of Facts, ¶¶ 10, 12, 13, 15.) The Officer Defendants contend that all assertions from these sources are hearsay and are inadmissible at the summary judgment stage as well as at trial. *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir.), *cert. denied*, 137 S. Ct. 493 (2016) ("If the evidence is inadmissible hearsay, the courts may not consider it."). The Court finds that the factual findings from the internal affairs report are admissible under Rule 803(8), and the Officer Defendants' reports are admissible as statements by a party opponent, but the statements other inmates made to McCottrell about the Officer Defendants allegedly aiming at the inmates are hearsay and are not admissible.[2] *See* Fed. R. Evid. 803(8) and 801(d)(2); *see also Jessup v. Miami-Dade Cty.*, 697 F. Supp. 2d 1312, 1322 (S.D. Fla. 2010), *aff'd*, 440 F. App'x 689 (11th Cir. 2011) ("factual

---

[2] The parties did not depose or take any statements from the other inmates.

4

findings in internal affairs reports are generally admissible under an exception to the hearsay rule"). Specifically, Plaintiffs attempt to use the statements other inmates made to Plaintiff McCottrell for the truth of the matter asserted, namely, that the Officer Defendants aimed their guns at the inmates. This is classic hearsay.

## III. The Officer Defendants' Perspective of the Incident

The Officer Defendants observed two inmates fighting in the dining hall. (*Id.* ¶ 41.) Correctional officers on the ground moved quickly to separate the fighting inmates, but one inmate continued to struggle and refused to comply with the officers' orders. (*Id.* ¶¶ 42-43.) The correctional officers were having difficulty restraining the inmate, and Defendant Williams "discharged a warning shot into the ceiling toward the nearest shot-box."[3] (*Id.*, Ex. D, Dec. of Labarin Williams ¶ 9.) Defendant White also fired a warning shot into the ceiling, although he did not aim for the shot box because other officers told him that shooting into the ceiling decreased the chance of a ricochet and he wanted to minimize the chance of a ricochet. (Defs.' Statement of Facts, Ex. E, Dec. of Marcus White ¶¶ 9, 11.)[4] The Officer Defendants both believed that it was necessary to shoot a warning shot to restore safety and order in the dining hall because they did not know if the struggling offender possessed a weapon and they believed he posed a threat to the correctional officers attempting to subdue him. (Defs.' Statement of

---

[3] Plaintiffs argue that the Court should reject the Officer Defendants version of events because it is "unlikely that both defendants fired into ceiling" because the ceiling is acoustic tile and would not have caused a ricochet. Despite this argument, the Court accepts the Officer Defendants' declarations that they fired into the ceiling. Plaintiffs testified that they themselves did not observe where the Officer Defendants aimed their guns, but they have attempted to create a factual dispute on this point by asserting that two inmates (known only as "Rico" and "Fuzz") told McCottrell that they observed one of the Officer Defendants aiming at the inmates. (Pls.' Statement of Facts ¶ 15.) As noted above, this statement, is inadmissible hearsay, and the Court will not consider it. *Cairel*, 821 F.3d at 830.

[4] Plaintiffs argue that Defendant White's statement that other officers told him to fire into the ceiling is hearsay, but the Court finds that Defendant White's statement about what other officers told him is admissible, not for the truth of the assertion, but to explain why he did not shoot directly at the shot box. F. R. Evid. 801(c)(2).

5

Facts ¶¶ 49-51.) The Officer Defendants have stated that they did not discharge their firearms with the intent or will to injure anyone. (Dec. of White ¶ 10; Dec. of Williams ¶ 10.) Neither of the Officer Defendants recall meeting or knowing Plaintiffs and they harbor no ill will towards either Plaintiff. (Defs.' Statement of Facts ¶¶ 55-56.) Plaintiffs also do not recall meeting the Officer Defendants and are not aware of any ill will or malicious intent on behalf of the Officer Defendants. (*Id.* ¶¶ 59-62.)

## IV.  Plaintiffs' Medical Treatment

Plaintiffs both received medical treatment in the Health Care Unit at Stateville. (*Id.* ¶¶ 64-66.) Clay received three stiches, and McCottrell received bandages for his neck and leg as well as Tylenol. (*Id.* ¶¶ 65-66.)

## LEGAL STANDARDS

## I.  Federal Rule of Civil Procedure 56

Summary judgment is appropriate when the record, viewed in the light most favorable to the non-moving party, reveals that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Zaya v. Sood*, 836 F.3d 800, 804 (7th Cir. 2016). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (citing *Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 248 (1986)); *Insolia v. Philip Morris, Inc.*, 216 F.3d 596, 599 (7th Cir. 2000) ("The existence of a mere scintilla of evidence supporting a plaintiff's position is insufficient; there must be evidence on which a jury could reasonably find for the plaintiff."). In ruling on a motion for summary judgment, the court must consider the record as a whole, in the light most favorable to the non-moving party, and draw all reasonable inferences in favor of the non-moving party. *Anderson*, 477 U.S. at 255.

The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that it is entitled to judgment as a matter of law. *Carmichael v. Vill. of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010). If the moving party demonstrates the absence of a disputed issue of material fact, "the burden shifts to the non-moving party to provide evidence of specific facts creating a genuine dispute." *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012). The non-movant must go beyond the pleadings and "set forth specific facts showing there is a genuine issue for trial." *Hannemann v. S. Door Cty. School Dist.*, 673 F.3d 746, 751 (7th Cir. 2012).

## II. Northern District of Illinois Local Rule 56.1

Northern District of Illinois Local Rule 56.1 governs how the parties identify material facts and potential disputed material facts. "The purpose of Rule 56.1 is to have the litigants present to the district court a clear, concise list of material facts that are central to the summary judgment determination. It is the litigants' duty to clearly identify material facts in dispute and provide the admissible evidence that tends to prove or disprove the proffered fact." *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 219 (7th Cir. 2015). Local Rule 56.1(a) "requires the party moving for summary judgment to file and serve a 'statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law.'" *Id.* at 218 (citation omitted). "The non-moving party must file a response to the moving party's statement, and, in the case of any disagreement, cite 'specific references to the affidavits, parts of the record, and other supporting materials relied upon.'" *Petty v. Chicago,* 754 F.3d 415, 420 (7th Cir. 2014) (citation omitted); *see also* L.R. 56.1(b)(3)(A). Local Rule 56.1(b)(3)(C) requires the non-moving party to file a separate

statement of additional facts. *See Thornton v. M7 Aerospace LP*, 796 F.3d 757, 769 (7th Cir. 2015).

Local Rule 56.1 statements and responses should identify the relevant admissible evidence supporting the material facts – not make factual or legal arguments. *See Zimmerman v. Doran,* 807 F.3d 178, 180 (7th Cir. 2015). "When a responding party's statement fails to dispute the facts set forth in the moving party's statement in the manner dictated by the rule, those facts are deemed admitted for purposes of the motion." *Curtis*, 807 F.3d at 218 (quoting *Cracco v. Vitran Exp., Inc.,* 559 F.3d 625, 632 (7th Cir. 2009)). The Seventh Circuit "has consistently upheld district judges' discretion to require strict compliance with Local Rule 56.1." *Flint v. City of Belvidere,* 791 F.3d 764, 767 (7th Cir. 2015).

## ANALYSIS

Plaintiffs have alleged that the Officer Defendants used excessive force against them in violation of the Eighth Amendment, which prohibits the infliction of cruel and unusual punishment. "[W]henever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is that set out in *Whitley*: whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian,* 503 U.S. 1, 6–7 (1992) (citing *Whitley v. Albers,* 475 U.S. 312 (1986)). Despite Plaintiffs' argument that the Court should apply a deliberate indifference standard, the Seventh Circuit has confirmed that the "maliciously and sadistically to cause harm" standard applies to claims, like those here, that correctional officers used excessive force in discharging firearms in prison. *Gomez v. Randle*, 680 F.3d 859, 864 (7th Cir. 2012) (applying *Hudson/Whitley* excessive force standard in correctional officer shooting case).

8

"[T]he extent of injury suffered by an inmate is one factor that may suggest 'whether the use of force could plausibly have been thought necessary' in a particular situation." *Hudson*, 503 U.S. at 7 (quoting *Whitley,* 475 U.S. at 321). "Injury and force, however, are only imperfectly correlated, and it is the latter that ultimately counts." *Wilkins v. Gaddy,* 559 U.S. 34, 38 (2010). "In determining whether the use of force was wanton and unnecessary, it may also be proper to evaluate the need for application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to temper the severity of a forceful response.'" *Hudson,* 503 U.S. at 7 (quoting *Whitley,* 475 U.S. at 321). Correctional officers must balance the need to maintain or restore discipline through force against the risk of injury to inmates. *Hudson,* 503 U.S. at 6. Courts must examine evidence both of the officer's subjective intent as well as the objective good faith of the officer's application of force given the particular circumstance. *Id*. at 8. The Seventh Circuit has distilled the rules from these Supreme Court cases into a two-part inquiry: (1) "whether the force [Plaintiff] describes rose above the *de minimis* level" and (2) "whether the actions of [the Officer Defendants] were designed expressly for the purpose of punishing or humiliating [Plaintiffs]." *Fillmore v. Page,* 358 F.3d 496, 504 (7th Cir. 2004). In other words, Plaintiffs' burden at the summary judgment stage is to present "evidence that 'will support a reliable inference of wantonness in the infliction of pain.'" *Id.* (quoting *Whitley,* 475 U.S. at 322).

Several courts have addressed factual scenarios, like here, where a correctional officer is accused of using excessive force for discharging his firearm and injuring an inmate. Since discharging a firearm is "plainly more than a *de minimis* use of force[,]" courts have focused on whether the correctional officers fired in good faith and to restore order or did so wantonly and without any effort to temper the severity of the force. *Gomez v. Palmer*, 181 F. Supp. 3d 498,

9

505–06 (N.D. Ill. 2015). This inquiry often rests on whether there is an issue of fact as to whether the officer issued a warning, where the officer aimed, and why he fired. *See, e.g.*, *id.*

In *Gomez*, for example, two inmates, neither of whom had a weapon, got in a fight while coming back from the dining hall. *Id.* at 500. Within seconds, two officers started to break up the fight using mace and physical force. *Id.* A third officer, who was patrolling the catwalk opposite the fight, fired two rounds from his shotgun, and he aimed the second round—at an angle from the seventh floor catwalk towards the inmates on the ninth floor catwalk—in the direction of the plaintiff, who was about 15 feet away from the fighting inmates. *Id.* The officer did not fire at the "black box" target designed to minimize ricochet, even though there was a target nearby, and as a result, one his pellets ricocheted off an unknown object and struck the plaintiff. *Id.* Under these facts, the court denied the officers' motion for summary judgment. *Id.* at 505. The court reasoned that there was a factual dispute as to where the officer aimed and why he fired, as well as whether the officers had the fight under control when the officer fired his second warning shot in the direction of inmates who were not involved in the fight. *Id.* The court also noted that there was evidence suggesting that the officer fired the second shot at inmates who were cursing at him and questioning why he fired the first shot, rather than to stop the fight. *Id.* at 506. In sum, the court found that a jury could find that the officer's use of force was wanton and unnecessary because no reasonable officer would have perceived a need to "shoot at inmates who were not involved" in a fight that was already under control. *Id. See also Lee v. Anderson,* No. 93 C 5654, 1997 WL 106256 (N.D. Ill. Feb. 12, 1997) (denying motion for summary judgment on prisoner excessive force claim because of factual disputes over where guard aimed his gun and whether it was necessary to shoot); *Sanchez v. O'Leary,* 90 C 6271, 1993 WL 96117 (N.D. Ill. Apr. 1, 1993) (same).

In contrast, in *Fields v. Millan,* No. 11–856–GPM, 2013 WL 6182928, at *1 (S.D. Ill. Nov. 26, 2013), an inmate got into a fight with two correctional officers in front of his cell on gallery five. A third correctional officer on the catwalk ordered the inmate to stop fighting, and when he refused to stop, the officer fired a warning shot into a "shot board" located on gallery nine between cells 920 and 921. *Id.* Buckshot from the officer's shot struck the plaintiff, who was in cell 922. *Id.* Other inmates testified that the officer was shooting at the cells, but the plaintiff himself did not see where the officer was aiming. *Id.* at *2. The officer testified that he aimed at and hit the shot board. *Id.* Emphasizing that negligence was not enough to support an Eighth Amendment claim, the court granted summary judgment in favor of the correctional officer defendant. *Id.* at *4. The court reasoned that the officer shot his gun in response to an ongoing altercation, did not know the plaintiff or have any intent to harm him, and did not "fire *upon* Plaintiff," only near him. *Id.* (emphasis in original). The court found that at most, the plaintiff had established that the officer was negligent in failing successfully aim at the shot board. *Id.* Distinguishing from cases where the officer intentionally aims and shoots at inmates, the court found that the plaintiff had not established that the officer intended to cause him harm or that the shot was even directed at the plaintiff, and accordingly granted summary judgment for the officer. *Id.* at *4-6.

Here, construing the evidence and all reasonable inference in Plaintiffs' favor, this case more closely resembles *Fields* than *Gomez*. Unlike *Gomez*, where there was a legitimate factual dispute about whether the officer aimed at the plaintiff and why he fired his gun, here, there is no admissible evidence suggesting that the Officer Defendants' use of force was wanton or unnecessary. Unlike *Gomez*, where the officer may have fired at inmates that were cursing at him, here, both Officer Defendants testified that they fired their guns because they wanted to

11

restore safety and order in the dining hall and they believed the struggling offender might possess a weapon and pose a threat to the officers on the ground. (Defs.' Statement of Facts ¶¶ 49-51.) The Officer Defendants' belief that the inmates' fight, and one inmates' subsequent 20-second struggle with a correctional officer, presented a dangerous situation requiring the use of force was reasonable given that fights often escalate quickly and inmates sometimes utilize makeshift but dangerous weapons to harm officers and others. (*Id.* ¶¶ 38-40.)

Most importantly, the Officer Defendants both testified that, like in *Fields* and unlike in *Gomez*, they did not fire *upon* the inmates and instead aimed their shots away from the inmates—at the ceiling and at the shot board on the ceiling. (Dec. of Labarin Williams ¶ 9; Dec. of Marcus White ¶¶ 9, 11.) The Officer Defendants' choice to aim at the ceiling and away from inmates, indicates that they were reasonably attempting to "temper the severity of a forceful response." *Hudson,* 503 U.S. at 7. Plaintiffs have speculated that the Officer Defendants were aiming at them, but it is undisputed that they did not see where the Officer Defendants were aiming and there is no admissible evidence that would create a genuine factual dispute regarding where the Officer Defendants aimed. (Dep. of Clay 33: 5; Dep. of McCottrell 21: 14-20.) As noted above, Plaintiffs have attempted to create a factual dispute by asserting that two inmates, identified only as "Rico" and "Fuzz," told McCottrell that they observed one of the Officer Defendants aiming at the inmates. (Pls.' Statement of Facts ¶ 15.) This statement, however, is inadmissible hearsay, and the Court may not consider it at the summary judgment stage. As a result, there is no evidence suggesting that the Officer Defendants aimed at the inmates. Further, it is undisputed that Plaintiffs and the Officer Defendants did not know each other or have any ill will towards each other that would indicate that the shooting was intentional. (Defs.' Statement of Facts ¶¶ 55-56, 59-62.)

The only other potential factual dispute revolves around when the officers separated inmates and whether the Officer Defendants fired their guns after the officers on the ground had fully resolved the altercation. Clay testified that the "fight was under control" and the officers were in the process of handcuffing the fighting inmates when the Officer Defendants fired their weapons, (Dep. of Clay, 25: 2-14.), and a report by the Illinois Department of Corrections Internal Affairs Department concluded that the Officer Defendants fired their weapons after officers had separated the fighting inmates in violation of Stateville policies. (Pls.' Statement of Facts, Ex. 1, Report of Investigation 4-5.) While officers had separated the fighting inmates when the Officer Defendants fired, the Officer Defendants testified that they fired because the correctional officers were having difficulty restraining one of the inmates, who was refusing to comply. (Dec. of Williams ¶ 9; Dec. of White ¶ 9.) The Court has reviewed the video of the incident, and it shows that while officers separated the fighting inmates within about 20 seconds of starting to fight, one inmate continued to struggle with a correctional officer for another 20 to 30 seconds. (Dining Hall Video.) It was during this time period that the Officer Defendants discharged their firearms to stabilize the situation. Given that the inmate resisted being subdued and that inmates can pose a danger to correctional officers when in close proximity to them, it was reasonable for the Officer Defendants to believe, in good faith, that it was necessary to fire a warning shot—aimed away from inmates at the ceiling—to restore order.

The Officer Defendants may have violated a department policy by firing after officers had separated the fighting inmates, however, that is not enough to support an excessive force claim. *Thompson v. City of Chi.*, 472 F.3d 444, 454 (7th Cir. 2006) ("42 U.S.C. § 1983 protects plaintiffs from constitutional violations, not violations of state laws or, in this case, departmental regulations and police practices.") (citations omitted). Under *Whitley*, Plaintiffs must "provide

evidence of specific facts creating a genuine dispute" that the Officer Defendants did not act in good faith to restore discipline and instead acted maliciously and sadistically to cause harm. *Carroll*, 698 F.3d at 564. Viewing the evidence and all reasonable inferences in Plaintiffs' favor, they have failed to establish a genuine issue of material fact as to whether the Officer Defendants' use of force was malicious and sadistic. The evidence indicates that the Officer Defendants plausibly believed that firing warning shots was necessary to restore order and stop an inmate from struggling with officers and that they tempered the severity of their force by aiming away from the inmates at the ceiling. *Hudson,* 503 U.S. at 7. There is no evidence indicating that the Officer Defendants' use of force was wanton, "designed expressly for the purpose of punishing or humiliating [Plaintiffs]," *Fillmore*, 358 F.3d at 504, or was applied "maliciously and sadistically to cause harm." *Hudson,* 503 U.S. at 6-7. Accordingly, the Court grants the Officer Defendants' summary judgment motion.

## CONCLUSION

For the foregoing reasons, the Court grants the Officer Defendants' motion for summary judgment.

**DATED:** May 22, 2017　　　　　　　　　　　　　　　**ENTERED**

　　　　　　　　　　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　　　　　　　　　AMY J. ST. EVE
　　　　　　　　　　　　　　　　　　　　　　　　　　　United States District Court Judge

14